UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| O.V. CARREATHERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:10cv0725 TCM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of O.V. Carreathers (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

**Procedural History**

Plaintiff applied for DIB and SSI in July 2007, alleging he was disabled as April 1 of that year by diabetes mellitus, Hepatitis C, and high blood pressure. (R.[1] at 116-128.) His applications were denied initially and after a hearing held in February 2009 before Administrative Law Judge (ALJ) Joseph W. Warzycki. (Id. at 6-69, 72-76.) The Appeals

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Jeffrey F. Magrowsky, Ph.D., testified at the administrative hearing.

Plaintiff was 53 years old at the time of the hearing.  (Id. at 22.)  He is 5 feet 11 inches tall and weighs approximately 207 pounds.  (Id. at 22-23.)  He is married and has a grown daughter.  (Id. at 23.)  He lives with his wife in a three-story house.  (Id.)  He has to climb 19 steps to enter the house.  (Id.)  He has a valid driver's license, but seldom drives.  (Id. at 23-24.)  His wife does most of the driving.  (Id. at 24.)  His wife is retired; they receive approximately $170 a month in food stamps.  (Id. at 24-25.)  He left school in the ninth grade and has since obtained his General Equivalency Degree (GED).  (Id. at 26.)  He can read and write.  (Id. at 27.)

Three times Plaintiff has been injured on the job and filed for worker's compensation.  (Id. at 25.)  The first two times he injured his back; the last time, in 2002, he partially amputated a finger on his right hand.  (Id. at 25-26.)

He went to "real estate school" in 1993 and used his license for a few years.  (Id. at 26.)

Plaintiff last worked in 2007.  (Id. at 27.)  He was a doorman at a hotel and worked approximately 30 hours a week.  (Id.)  He was laid off after one and one-half years on the job for taking too many breaks caused by problems standing on his feet and needing to frequently

urinate.  (Id. at 27, 32, 50.)  He has not tried to work since because of his health problems.  (Id. at 28.)  He does not know of any work he could do.  (Id.)

When working as a doorman, the heaviest weight he had to lift was approximately seventeen pounds.  (Id.)  Before that he worked for the City of St. Louis driving trucks, operating equipment, and trimming trees.  (Id. at 29.)  The heaviest weight he had to lift then was forty pound tree limbs.  (Id. at 30.)  In 1991, he worked as a parking attendant for one year.  (Id.)

Plaintiff does not prepare his own meals; his wife does.  (Id. at 32.)  He helps around the house by picking up trash and taking clothes baskets to the basement.  (Id. at 33.)  He does not wash dishes because his wife does that.  (Id.)  He does not vacuum because his feet hurt.  (Id.)  He has difficulty holding a mop because of hand cramps.  (Id. at 34.)  These cramps began in the last few years.  (Id. at 48.)  Also, his thumbs "pop."  (Id.)  He grocery shops by himself once a month for approximately an hour.  (Id. at 34.)  He lays around in the afternoon because his back hurts from sitting.  (Id.)  He takes three naps a day, each for at least an hour.  (Id. at 49.)  He mows the little bit of grass that they have.  (Id. at 36.)  He listens to the radio sometimes and reads the Bible.  (Id. at 34-35.)  He and his wife go out sometime.  (Id. at 36.)  They occasionally fish in Forest Park, but have not done so in at least a year.  (Id. at 37.)

Plaintiff is a minister at church.  (Id. at 35.)

Plaintiff can walk for approximately one mile, although he cannot walk farther than eight blocks without having to take a break.  (Id. at 37, 50-51.)  He does not have a problem bathing.  (Id. at 37-38.)  He does not drink, smoke, or take illegal drugs.  (Id. at 38.)  He takes

insulin three times a day for his diabetes.  (Id. at 38-39.)  He takes medication for his high blood pressure, which he has had most of his life.  (Id. at 39.)  His hepatitis makes him fatigued and, sometimes, makes his feet numb.  (Id. at 40-41, 47.)  Because of problems with his feet, including pain and numbness, he cannot stand for longer than fifteen minutes.  (Id. at 47.)  He elevates his feet during most of the day.  (Id. at 48.)  The medication he takes makes him drowsy.  (Id. at 42.)  He takes Advil for his back pain.  (Id. at 43.)

Plaintiff has never been in a mental hospital or under psychiatric care.  (Id. at 44.)

He has difficulty concentrating.  (Id. at 45.)  He can lift approximately fifteen pounds.  (Id.)  His knees hurt all the time.  (Id.)  He has never had a doctor examine his knees.  (Id.)

Plaintiff testified that he could no longer do some of the activities he listed when completing a function report.  (Id. at 46.)

Dr. Magrowsky testified as a vocational expert (VE).

He inquired of Plaintiff about his jobs as a cashier at Busch stadium, as a worker boxing homeopathic remedies at a pharmacy, and as an associate minister at a Pentecostal church.  (Id. at 52-53.)  For a congregation of 1500, there were approximately 100 ministers.  (Id. at 53.)  He is not ordained, but does have a license.  (Id.) He primarily walks the "candidate down to the baptism."  (Id. at 54.)  He has given short sermons and used to pray at the alter for approximately fifteen minutes.  (Id.)  He does not do any pastoral counseling.  (Id.)  The cashier job was seasonal; the boxing job was for a few weeks.  (Id. at 53.)

The VE described Plaintiff's past work in terms of job title, Dictionary of Occupational Titles (DOT) number, skill level, and exertional level.  Plaintiff's job as a doorman carried the

- 4 -

title of "houseman" with a DOT number of 324.577-010, had a medium exertional level as he performed it and a light level as it could be performed, and unskilled. (Id. at 55.) His work as a laborer had a number of 922.687-058, had a medium exertional level, and was unskilled. (Id.) His work as an equipment operator was medium. (Id.) If it was heavy equipment, the DOT number was 869.683-010; it was skilled work. (Id.) If it was driving a dump truck, it was semi-skilled. (Id.) His job as a minister was skilled and light; the DOT number was 120.107-910; the specific vocational preparation (SVP)[2] number was eight. (Id. at 56, 59.) An SVP of eight requires four to ten years of full-time work. (Id. at 59, 61.) The VE considered Plaintiff's praying as possibly being problem solving. (Id. at 60.) He assumed that Plaintiff had to write down notes before giving a sermon. (Id.) Assuming that Plaintiff worked a total of nine months during three seasons as a cashier, DOT number 211.462-010, the work is considered unskilled and light. (Id. at 57-58.)

The VE was asked whether there was any transferable work skills of a hypothetical claimant who was 53 with a high school GED; had past relevant work as described by the VE; was capable of performing the exertional demands of light work[3]; could sit, stand, and walk each for six out of eight hours for a combination of eight out eight; was limited to occasional stooping, crouching, kneeling, or crawling; and was limited to occasional exposure to ladders,

---

[2]The Eighth Circuit Court of Appeals recently observed that "[t]he SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. . . .  2 *Dictionary of Occupational Titles* app. C, at 1009 (4th ed.1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

ropes, and scaffolds.  (Id. at 56.)  The job of minister would include such transferable skills as writing or keeping records, scheduling appointments, solving problems, and writing sermons. (Id.)  His jobs operating equipment would have transferable skills of operating machines.  (Id. at 57.)  Jobs for housemen, cashier, and minister existed in significant numbers at the state and national levels.  (Id. at 58.)  Jobs requiring related skills, e.g., ticket seller and office helper, also existed in such numbers.  (Id. at 58-59.)  The jobs of houseman, cashier, and ticket seller require frequent use of the hands.  (Id. at 61-62.)

Plaintiff's attorney then described a hypothetical claimant with slightly more restrictions than the one described by the ALJ.  (Id. at 63.)  This claimant could occasionally lift only fifteen pounds, stand only two out of eight hours, had to alternate between sitting and standing for six of eight hours, was limited to occasional fine fingering and handling, and had to take at least two breaks in addition to those normally provided.  (Id.)  The VE testified that there were jobs such a claimant could do, e.g., office helper.  (Id.)  If Plaintiff's job as a minister qualified as substantial gainful activity (SGA), he could perform this job also.  (Id. at 65.) Occasionally praying for someone and giving a short sermon did not appear to be SGA.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and an assessment by a non-medical consultant of his residual functional capacity.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 151-58.) Diabetes and Hepatitis C limited his ability to work by causing him to feel faint when his sugar levels dropped, making him tired, and causing the bottom of his feet to ache. (Id. at 152.) His impairments first interfered with his ability to work on April 1, 2007; however, he stopped working on January 20, 2007, when he was terminated. (Id.)

Plaintiff also completed a Function Report. (Id. at 164-71.) Asked to describe his daily activities, he reported that he checks his sugar level four times a day and takes insulin three times a day. (Id. at 164.) Also, he drives his wife to work, walks, eats lunch, does minor household chores if he is feeling okay, and goes to church. (Id.) His impairments affect his sleep by giving him nightmares if his sugar levels are low. (Id. at 165.) The only meals he prepares are sandwiches. (Id. at 166.) His hobbies include reading, fishing, and walking. (Id. at 168.) He tries to walk three or four times a week when he is feeling okay. (Id.) He enjoys church and the fellowship there. (Id.) His impairments adversely affect his ability to lift, squat, hear, climb stairs, see, complete tasks, concentrate, understand, and follow instructions. (Id. at 169.) They do not affect his abilities to stand, reach, walk, sit, kneel, remember, use his hands, and get along with others. (Id.) He can walk two miles before having to rest. (Id.) He

- 7 -

then cannot resume walking until the next day.  (Id.)  He wears glasses to read, and has for the past nine years.  (Id. at 170.)

On one Work History Report, Plaintiff listed four jobs he had held during the past fifteen years.  (Id. at 140-50.)  The most recent, from October 2005 to January 2007, was as a doorman.  (Id. at 140.)  He had also sporadically worked as a laborer from January 1991 to December 1996 and as a seasonal worker form June 1991 to October 1993.  (Id.)  He had worked as a parking attendant in 1991.  (Id.)  He had no earnings in 2003 and 2004.  (Id. at 130.)  He did not describe the exertional or skill demands of any of the jobs except the one as a seasonal worker.  (See id. at 141-44.)  This job required that he trim trees, drive a dump truck, operate machines and devices, walk for a total of five hours each day, stand for six and a one-half hours; sit for one; climb for three; stoop, kneel, and crouch each for seven; handle, grab, or grasp big objects for six; reach for three; and write, type, or handle small objects for seven.  (Id. at 144-45.)  The heaviest weight he lifted was 100 pounds.  (Id. at 145.)  He frequently lifted 50 pounds or more.  (Id.)

In another Work History Report, Plaintiff also listed a job as a cashier at Busch Stadium from October 1996 to May 2001 and as a real estate agent working on commission. (Id. at 173.)  The cashier job required that he walk and stand each for a total of seven hours each day; sit, stoop, kneel, and crouch for two hours each; handle, grab, or grasp big objects for three; and write, type, or handle small objects for four.  (Id. at 175.)  He frequently had to lift ten pounds and occasionally lift as much as twenty pounds.  (Id.)

- 8 -

On a list of medications as of February 2009, Plaintiff named Novolin (short-acting form of insulin), Levemir (a long-acting form of insulin), Atenolol (a beta-blocker), Norvasc (a calcium channel blocker), and Lisinopril. (Id. at 182.) The first two were for his diabetes; the last three were for hypertension. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in 2002, in May, when Plaintiff went to the emergency room at St. Louis ConnectCare (ConnectCare) after running out of his medication. (Id. at 267.) He had no other complaints. (Id.)

Plaintiff returned to ConnectCare in June 2003, reporting that he was nauseous and felt excessively tired. (Id. at 263-65.) He denied experiencing any pain. (Id. at 264.) He had been diagnosed with Hepatitis C ten years earlier – he had been an intravenous user of heroin thirty years ago – and had undergone interferon therapy in 1993. (Id. at 264-65.) He was to discuss adjusting his diabetes medication with his primary care physician and return in three months. (Id. at 265.) A later ultrasound of his abdomen revealed no abnormalities. (Id. at 262.)

Plaintiff missed his follow-up appointment in September. (Id. at 261.)

Plaintiff did go to the urgent care clinic at ConnectCare the next month after running out of his diabetes medication. (Id. at 256-60.)

At a follow-up appointment at ConnectCare in April 2004 for his hepatitis, Plaintiff had no complaints, including no complaints of abdominal pain, weakness, fatigue, weight loss, chest pain, or shortness of breath. (Id. at 253-55.) He was to return in three months. (Id. at 254.)

In August, Plaintiff was seen at the podiatry clinic at ConnectCare on referral for a foot examination secondary to this diabetes.  (Id. at 251-52.)  He had no complaints or pain.  (Id. at 251.)  He was instructed to see his primary care physician for a follow-up in five months. (Id.)

Plaintiff consulted the health care providers at Myrtle Hilliard Davis Comprehensive Health Centers (Davis Centers) in May 2006.  (Id. at 206-07.)  He was compliant with his medication.  (Id. at 207.)  His liver function tests (LFTs) were elevated, possibly due to the metformin he was taking for his diabetes.  (Id.)  He was to be referred to nutritional counseling for his diabetes and to a gastrointestinal clinic for evaluation of his hepatitis.  (Id.)  When Plaintiff returned the following month, he had no complaints.  (Id. at 206.)  His hypertension was described as "acceptable for now."  (Id.)  His diabetes was under "suboptimal control." (Id.)  He was to continue with his current medications and be referred to diabetes education and eye, feet, and dental clinics.  (Id.)

Plaintiff was seen at the ConnectCare gastrointestinal (GI) clinic in July.  (Id. at 194-96, 248-50.)  His diabetes was described as first being diagnosed in 1983; his hypertension in 1991.  (Id. at 194.)  He was instructed not to take the metformin for his hepatitis until his blood work was done.  (Id. at 195.)

In September, Plaintiff went to ConnectCare for follow-up for his hepatitis.  (Id. at 245.) He voiced no complaints; however, the physician was concerned about a possible recurrence of his hepatitis.  (Id.)

When he next saw the doctor at the GI clinic, in October, he denied having any pain or fatigue.  (Id. at 188, 242-43.)  He wanted to  see his primary care physician before deciding whether to restart his medication.  (Id. at 189.)  He did not keep his follow-up appointment the following month.  (Id. at 186, 241.)

He did, however, return that month to the Davis Centers.  (Id. at 205.)  His diabetes was under poor control; his hypertension was under fair control; his hepatitis was under good control.  (Id.)  He was to discontinue the metformin and continue on his hypertension medications.  (Id.)  He was to continue to follow-up at ConnectCare and was also to return to the Davis Centers in two months.  (Id.)

Plaintiff was a walk-in at the Davis Centers in March 2007 after having blood in his urine for two days and a "slightly aching" back.  (Id. at 202.)  He was examined, but no medication was given.  (Id. at 201.)  The blood in his urine had stopped after two to three days.  (Id.)  A week later, he was asymptomatic.  (Id.)  His diabetes, however, was "uncontrolled.."  (Id.)  His hypertension was controlled.  (Id.)

Plaintiff returned to the Davis Centers on April 10 because he was running out of insulin.  (Id. at 201.)  His diabetes continued to be uncontrolled.  (Id.)  He was to return in one to two weeks for fasting blood tests.  (Id.)  Tests were done on May 1.  (Id. at 218-19, 222-25, 227.)

Plaintiff was again seen at the GI clinic at ConnectCare in October for hepatitis and colon screening.  (Id. at 239-40.)  He had no complaints of pain.  (Id. at 239.)

Plaintiff returned to the GI clinic in March 2008 for a follow-up visit.  (Id. at 312-13, 340-43.)

Plaintiff was seen in April at the Davis Centers for a routine visit.  (Id. at 291-93.)  He reported not feeling poorly; his examination, including of his musculoskeletal and neurological symptoms, was normal.  (Id.)  He was diagnosed with benign essential hypertension.  (Id.)

Six days later, Plaintiff was seen at the GI clinic at ConnectCare.  (Id. at 333-34.)  He denied any heart or kidney problems.  (Id. at 333.)

Two days later, Plaintiff had blood tests run.  (Id. at 299-303.)  The results were reviewed at his May visit to the Davis Centers.  (Id. at 288-90.)  Again, he had no complaints, including no increase in urinary frequency; again, his examination was normal.  (Id. at 288-89.)  The physician, Nicole Delsoin, M.D., informed him he needed to improve his compliance with his medication – he had not been taking his Levemir every evening – and exercise and diet.  (Id. at 289.)

Plaintiff had unremarkable follow-up visits at the GI clinic in May and June.  (Id. at 325-26, 330-31.)  The next month, Plaintiff reported that he had no pain, but did have occasional irritability.  (Id. at 304-05.)

He complained at his July visit of fatigue, although he had a "fair activity level."  (Id. at 321-22.)  He had not taken his blood pressure medication for two days.  (Id. at 321.)  He had occasional feelings of sadness, but did not want any medication.  (Id.)

Plaintiff saw Dr. Delsoin again in August and in September.  (Id. at 284-87, 296-97.)  In September, he reported experiencing numbness in his feet.  (Id. at 284.)  His gait and stance

- 12 -

were normal.  (Id. at 285.)  His diabetes was controlled; his hyperlipidemia was not.  (Id.)  He was "hardly exercising."  (Id.)  He was diagnosed with diabetic peripheral neuropathy and told that the Levemir could not be discontinued even if his diabetes appeared to be under control.  (Id. at 285-86.)  He was to continue with his medications.  (Id. at 286.)

Also in September, Plaintiff was seen at the GI clinic.  (Id. at 316-20.)  He reported having a good activity level and no feelings of sadness.  (Id. at 319.)  The occasional irritability remained.  (Id.)  The next month, it was noted that Plaintiff had stopped his hepatitis medication due to a lack of response and was waiting the availability of new medication.  (Id. at 314-15.)  He was to return in one year.  (Id. at 314.)

An examination at his routine visit to Dr. Delsoin in December was normal, including of his musculoskeletal and neurological systems.  (Id. at 280-83, 294-95)  His gait and stance were  normal; he did not have an abnormal sensory exam.  (Id. at 282.)  He was to be referred to a podiatrist, dentist, and ophthalmologist.  (Id.)

Plaintiff returned to the GI clinic in October, again reporting no pain.  (Id. at 306.)  He had stopped taking any medication for his hepatitis.  (Id.)

Also before the ALJ was a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff completed by an agency non-medical consultant.  (Id. at 228-33.)  The primary diagnoses were diabetes mellitus and Hepatitis C.  (Id. at 228.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day.

(Id. at 229.)  Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 230-32.)

### The ALJ's Decision

Analyzing Plaintiff's application pursuant to the Commissioner's sequential evaluation process, the ALJ first found that Plaintiff had not been engaged in substantial gainful activity since his alleged onset date of April 1, 2007.  (Id. at 10-11.)

The ALJ next found that Plaintiff had severe impairments of diabetes mellitus, Hepatitis C, and high blood pressure.  (Id. at 11.)  The medication for his diabetes had been adjusted due to the condition being poorly controlled; the medication for his hepatitis had been discontinued due to Plaintiff being a nonresponder; and the medication for his hypertension resulted in that condition being "fairly well controlled."  (Id.)  These three impairments did not, singly or in combination, meet or equal an impairment of listing-level severity.  (Id. at 12.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that his impairments precluded him from lifting and carrying more than ten pounds frequently and twenty pounds occasionally; standing, sitting, and walking more than six hours for a combination of eight hours; and more than occasionally stooping, crouching, kneeling, crawling, or climbing ladders, ropes, or scaffolds.  (Id.)

In reaching his conclusions about Plaintiff's RFC, the ALJ reviewed Plaintiff's testimony and the other evidence of record.  (Id. at 12-14.)  Addressing Plaintiff's diabetes, the ALJ noted that he had begun using insulin in May 2006, had not consistently complained of any ongoing problems with dizziness, vertigo, dysuria (difficulty urinating), or increased urinary frequency.

- 14 -

(<u>Id.</u> at 13.)  He had not reported any ongoing problems with numbness or tingling in his feet. (<u>Id.</u>)  He regularly reported to his physicians that he had no complaints.  (<u>Id.</u>)  And, he had not had any similar symptoms for at least eighteen months when complaining in September 2008 about numbness in both feet.  (<u>Id.</u>)  Similarly, Plaintiff did not regularly complain about any hepatitis-related symptoms.  (<u>Id.</u>)  He sometimes complained of fatigue, but did not do so regularly.  (<u>Id.</u>)  He reported twice in 2008 that he had a good activity level and no significant problems.  (<u>Id.</u>)  His hypertension was fairly well controlled by medication.  (<u>Id.</u>)

The ALJ noted that no treating or examining doctor had stated or implied that Plaintiff was disabled or seriously incapacitated, nor had any doctor placed any restrictions on Plaintiff greater that the RFC found by the ALJ.  (<u>Id.</u> at 14.)

Addressing the question of Plaintiff's credibility, the ALJ found that his subjective complaints were not fully supported by the evidence, as previously discussed, his appearance at the hearing was inconsistent with his complaints, his statements included such inconsistencies as saying he could not stand for longer than fifteen minutes but he could walk one mile, he was able to lift fifteen pounds, he was laid off from his job on his alleged disability onset date, and he had not complained to any doctor of medication side effects of drowsiness. (<u>Id.</u>)

With his RFC, Plaintiff could return to past relevant work as a minister, cashier, and houseman, and could also work as a ticket taker and officer helper.  (<u>Id.</u> at 14-15.)  He was not, therefore, disabled within the meaning of the Act.  (<u>Id.</u> at 15.)

<u>**Additional Records before the Appeals Council**</u>

After the ALJ rendered his adverse decision, Plaintiff's attorney submitted additional records to the Appeals Council.

These records included a note from Dr. Delsoin dated August 25, 2009, reading that Plaintiff was unable to stand or walk during a normal work day due to neuropathic pain in his legs and feet. (Id. at 348, 356.) Also, he had severe pain in his arms and hands. (Id.)

The following month, she completed a Physical Residual Functional Capacity Questionnaire. (Id. at 350-54.) She had been seeing Plaintiff every three months for two and one-half years. (Id. at 350.) He was unable to grasp and hold objects without pain in his arms and hands; he could not do the recommended exercises. (Id.) The only medication offered by the clinic was Gabapentin; it was inefficient. (Id. at 351.) Plaintiff's impairments had lasted or could be expected to last at least twelve months. (Id.) He was not a malingerer. (Id.) His impairments were reasonably consistent with his symptoms and functional limitations. (Id.) His pain was frequently severe enough to interfere with his attention and concentration. (Id.) He could not tolerate even a "low stress job" due to the neuropathic pain in his upper and lower extremities. (Id.) Plaintiff could not walk farther than one block without having to rest or experiencing severe pain; could not sit for longer than thirty minutes or stand for longer than ten minutes at one time. (Id. at 352.) During an eight-hour work day, he could not sit for a total of less than two hours and would need to shift positions at will and take unscheduled breaks. (Id.) He could occasionally lift less than ten pounds. (Id. at 353.) He had significant limitations in doing repetitive reaching, handling, or fingering. (Id.) He would have "good"

days and "bad" days and was likely to be absent from work more than four times a month.  (Id. at 354.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

- 17 -

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

- 18 -

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524).  After considering these factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as [ ]he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that

- 20 -

decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) failing to consider diabetic peripheral neuropathy as one of his severe medically determinable impairments and failing to include it in his hypothetical question to the VE, (2) failing to ask Dr. Delsoin for her opinion as to Plaintiff's RFC, (3) relying on the PFCA by a non-medical consultant, (4) concluding that Plaintiff had no complaints of side effects from his medication, and (5) not considering whether Plaintiff satisfied the criteria of Rule 201.14.

Neuropathy. The medical records before the ALJ include one complaint by Plaintiff of numbness in his feet. The doctor to whom he made the complaint, Dr. Delsoin, diagnosed him with diabetic peripheral neuropathy.[4] This type of neuropathy "causes a dulling of the

---

[4]The parties focus their respective arguments on whether Plaintiff's neuropathy is a severe impairment on Listing 6.00, including referring to the definition of neuropathy in 20 C.F.R. pt. 404, subpt. P, app. 1 § 6.00B(10) and whether Plaintiff satisfied the criteria in Listing 6.02. Section 6.00

sensations of pain, temperature, and pressure, especially in the lower legs and feet . . . ."

Stedman's Medical Dictionary, 1204 (26th ed. 1995). "Peripheral neuropathy is presumptively

disabling as a neurological disorder with a showing of *significant and persistent*

disorganization of motor function in two extremities, resulting in sustained disturbance of gross

and dexterous movements, or gait and station." **Cunningham v. Apfel**, 222 F.3d 496, 502 n.8

(8th Cir. 2000) (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 9.08(A)) (emphasis added).  Thus,

to satisfy this Listing, Plaintiff must show that the numbness in his feet was significant and

persistent.  See **Carlson v. Astrue**, 604 F.3d 589, 593 (8th Cir. 2010) ("The claimant has the

burden of proving that his impairment meets or equals a listing.").

        When applying for DIB and SSI, Plaintiff noted that his impairments did not adversely

affect his abilities to stand and walk.  Indeed, his hobbies included walking.  The first, and only

mention, in the medical records before the ALJ of diabetic peripheral neuropathy is in

September 2008.  His gait and stance were normal.  The preceding records consistently note

that Plaintiff had no complaints.  The same month, Plaintiff reported to a different doctor that

he had a good activity level.  Three months later, when next examined by Dr. Delsoin, his gait

and stance were again normal, as was his sensory exam.[5]  Two months later, Plaintiff testified

---

is for genitourinary impairments; Listing 6.02 is for impairments of renal function.  Plaintiff, however,
was diagnosed with *diabetic* peripheral neuropathy, which is the subject of Listing 9.08.

        [5]In support of his argument that the ALJ erred, Plaintiff cites the August 2009 opinion of Dr.
Delsoin that his neuropathic pain prevents him from standing or walking during a normal work.  This
opinion was before the Appeals Council, not the ALJ.  Because it was presented to the Appeals
Council and arguably related to the period before the ALJ's decision, it becomes part of the
administrative record.  See **Gragg**, 615 F.3d at 939 n.2 (citing Cunningham, 222 F.3d at 500).
Regardless, the opinion is inconsistent with Dr. Delsoin's treatment records and is not entitled to any
great weight.  See **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) ("A treating physician's

two months later that he could not stand for longer than fifteen minutes because of the pain and numbness in his feet; however, he could walk for one mile.

"A 'severe impairment is defined as one which significantly limits [the claimant's] physical or mental ability to do basic work activities.'" **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006)) (alteration in original).  Conversely, an impairment is not severe if it "amounts only to a slight abnormality that would not significantly limit the claimant's ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work[.]" **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  "Severity is not an onerous requirement . . . , but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations omitted).

Given the paucity of any complaints or supporting observations of peripheral neuropathy, the ALJ did not err in not finding it to be a severe impairment.

Plaintiff argues that it should have been included in the hypothetical question posed by the ALJ to the VE.  A properly phrased hypothetical question to a VE must "capture the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997).  "A hypothetical question is properly formulated[, however,] if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'"

---

opinion is given controlling weight *if* it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); **Wagner**, 499 F.3d at 849 (holding that "an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record") (internal quotations omitted).

**Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001)).  <u>Accord</u> **Goff**, 421 F.3d at 794; **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999).   Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question.  **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).  For the reasons set forth above, the ALJ's hypothetical question properly included only the concrete consequences of the impairments found to be supported and did not include peripheral neuropathy.

Developing the Record.  Plaintiff argues that the ALJ failed in his duty to fully and fairly develop the record by not contacting his treating physician, Dr. Delsoin, to ask for her opinion on his ability to perform work-related functions.  As noted above, however, it is the claimant's duty to prove his RFC.  <u>See</u> **Moore**, 572 F.3d at 523.  Moreover, "[t]he ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'"  **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)).  A crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff.  <u>See e.g.</u> **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons**, 497 F.3d at 819 (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).  <u>Cf.</u> **Bowman v. Barnhart**, 310 F.3d 1080, 1085 (8th Cir. 2002) (ALJ erred by not contacting treating physician

for assessment on how claimant's impairments affected his ability to work; treating physician had treated claimant for thirty years and had medical notes with numerous entries indicating office visits or telephone calls, but had issued only cursory letter listing claimant's impairments).

Plaintiff further argues that the ALJ erred by finding that he had not complained of medication side effects and by not contacting his physicians for more information about such effects if such was needed.  This argument misapprehends the relevant query.  In the context of evaluating Plaintiff's credibility, the ALJ noted that his testimony about medication side effects of drowsiness was inconsistent with his lack of complaints of such effects to his doctors. Inconsistencies in the record are proper considerations when evaluating a claimant's credibility.[6]  See **Wildman v. Astrue**, 596 F.3d 959, 968 (8th Cir. 2010); **Owen**, 551 F.3d at 801.

RFC.  Plaintiff next argues that the ALJ erred by relying on the RFC assessment of a non-medical, non-examining consultant.  Again, he misapprehends the record.  The ALJ did not rely on such assessment; indeed, he did not even cite it.  Any inference of reliance must be premised on the same restrictions as listed in the PRFCA being found by the ALJ.

In **Sultan v. Barnhart**, 368 F.3d 857 (8th Cir. 2004), the Eighth Circuit Court of Appeals held that the opinions of nonexamining state agency consultants are entitled to little weight when evaluating a claimant's disability.  **Id.** at 863.  In the instant case, there is no indication of any weight being placed on the consultant's opinion.

---

[6]The Court notes that Plaintiff does not challenge the ALJ's assessment of his credibility.  Had he done so, the challenge would have been unavailing for the reasons cited by the Commissioner.

A PRFCA by a non-medical, nonexamining person was also at issue in **Dewey v. Astrue**, 509 F.3d 447 (8th Cir. 2007), cited by Plaintiff.  In that case, however, the ALJ explicitly credited the PRFCA on the mistaken belief that it had been authored by a physician.  **Id.** at 448-49.  Noting that this PRFCA was less restrictive than that of the claimant's treating physician, the Eighth Circuit held that it was not harmless error because it could not be said that the ALJ would inevitably have reached the same conclusion had he understood that the PRFCA had not been completed by an acceptable medical source.  **Id.** at 449-50.

Rule 201.14.  The Commissioner may find a claimant disabled at step five "by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."  **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  Rule 201.14 requires a finding of disabled for a person whose maximum sustained work capability is limited to sedentary work and who is closely approaching advanced age,[7] with a high school education or its equivalent, and no transferable skills.  20 C.F.R. pt. 404, subpt. P, App. 2, Table 1.  "Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing," 20 C.F.R. § 404.1567(a), and "represents a significantly restricted range of work," 20 C.F.R. pt. 404, Subpt. P, App. 2, § 200.00(g)(4).  The ALJ determined that Plaintiff had a maximum sustained work capability greater than required for sedentary work.  That determination is supported by substantial

---

[7]A person is closely approaching advanced age if he or she is between 50 and 54, inclusive, years old.  See 20 C.F.R. § 404.1563(d).

- 26 -

evidence on the record as a whole; consequently, Plaintiff's reliance on Rule 201.14 is unavailing.

**Conclusion**

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  7th  day of September, 2011.